**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| DONALD D. NORMAN, ) | |
| ) | CASE NO.  1:08cv2531 |
| Plaintiff, ) | |
| ) | |
| v. ) | JUDGE KATHLEEN M. O'MALLEY |
| ) | |
| MICHAEL J. ASTRUE, ) | MAGISTRATE JUDGE GREG WHITE |
| Commissioner of Social Security ) | |
| ) | **REPORT AND RECOMMENDATION** |
| Defendant. ) | |

Plaintiff Donald D. Norman ("Norman") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Norman's claim for relief under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, *et seq*.  The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.

For the reasons set forth below, the Magistrate Judge recommends that the final decision of the Commissioner be VACATED and REMANDED for further proceedings consistent with this Report and Recommendation.

## I. Procedural History

On January 3, 2005, Norman filed an application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") alleging a disability onset date of September 25, 2000, and claiming that he was disabled due to herniated discs, degenerative disc disease of the lumbar spine, diabetes and depression.  His application was denied both initially and upon reconsideration.  Norman timely requested an administrative hearing.

On April 29, 2008, Administrative Law Judge Morley White ("ALJ") held a hearing during which Norman, represented by counsel, testified.  Hershel Goren, M.D., testified as the Medical Expert ("ME") and Carol O. Mosley testified as the Vocational Expert ("VE").  On May 23, 2008, the ALJ found Norman was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

On appeal, Norman claims the ALJ erred by: (1) failing to properly evaluate Norman's obesity; (2) failing to find Norman's diabetes to be a severe impairment; (3) failing to properly evaluate the opinions provided by treating sources; and (4) applying an improper "sit and squirm" test as a way to evaluate Norman's symptoms.

## II. Evidence

*Personal and Vocational Evidence*

Born on August 12, 1961 and age forty-seven (47) at the time of his administrative hearing, Norman is a "younger" person.  *See* 20 C.F.R. § 404.1563 (c). Norman has a high school equivalent education and past relevant work as a volunteer firefighter, furniture delivery person, and painter.

*Medical Evidence*

<u>Back Impairments</u>

On September 27, 2000, Norman sought medical attention from Richard M. Cole, D.O., because he was experiencing back pain. (Tr. 287.) Dr. Cole diagnosed Norman as having an antalgic gait, paralumbar muscle spasm, slightly diminished deep tendon reflexes, and radicular symptoms in the lower right extremity. *Id.*

On October 4, 2000, an MRI revealed marked disc flattening and dessication of the L4-5. (Tr. 304.) It also showed a posterior disc bulge with a probable focal herniation. *Id.* Further, the test indicated a potential impression of the descending L5 nerve roots bilaterally due to facet hypertrophy compromising the thecal sac. *Id.* The L5-S1 report identified additional disc flattening and dessication, a broad-based disc bulge, moderately severe bilateral foraminal stenosis, and potential L5 nerve root impression. (Tr. 305.)

On October 9, 2000, Norman returned to Dr. Cole to discuss the results of the MRI. Dr. Cole determined that Norman suffered from degenerative disc disease at the L4-5 and L5-S1 levels with probable focal herniation at L4-L5 and bilateral foraminal stenosis at L4-L5 and L5-S1. He also concluded that there was pressure against the L4-L5 nerve roots and facet hypertrophy. (Tr. 288.) Consequently, Dr. Cole referred Norman to John Collis, M.D., for a surgical evaluation.

On October 19, 2000, Dr. Collis performed an examination that revealed Norman walked with a marked limp of the right leg. (Tr. 348.) An application of the straight leg raising test produced low back pain and right leg pain at twenty degrees and low back pain from the left leg at thirty degrees. *Id.* A pin sensation exam exhibited decreased sensation in the right lateral

3

thigh. (Tr. 349.) Ultimately, Dr. Collis concurred with Dr. Cole's diagnosis that Norman suffered from degenerative disc disease in the L4 and L5 levels and advised Norman to lose weight and undergo three nerve blocks. (Tr. 347.) He further noted in his report that Norman should not return to work until after his prescribed treatments were completed. *Id.*

On November 9, 2000 Norman received the first of his three nerve blocks. The second, a bilateral L4 and L5 paraspinal block, was administered on December 7, 2000. The third, a caudal epidural injection, was administered on March 8, 2001. (Tr. 167, 176, 186.)

On March 22, 2001, Dr. Cole noted that Norman exhibited no improvement of his previously diagnosed symptoms and that Norman should abstain from work until September 25, 2001. (Tr. 290.)

On June 14, 2001, Dr. Cole evaluated Norman's progress after a month of physical therapy. (Tr. 290.) Dr. Cole noted that Norman's symptoms were consistent with his previous examinations. *Id*. He ordered Norman to remain off of work for three months. *Id*.

On December 16, 2003, Norman visited Dr. Cole for a re-evaluation. (Tr. 292.) Dr. Cole observed that Norman had a limited range of motion, paralumbar muscle spasms, and an antalgic gate. *Id*. Neurologic findings were "grossly within normal limits," though Dr. Cole observed some generalized weakness in the right lower extremities when compared to the left. *Id*.

On February 1, 2005, in his response to a questionnaire from the Bureau of Disability Determination, Dr. Cole reaffirmed his position in regards to Norman's work capability and stated that Norman could not sit or stand for more than ten minutes and could not lift more than ten pounds. (Tr. 315.) He further elaborated that Norman could not push,pull, sit, walk, file, or carry without pain. *Id*.

On March 24, 2005, state agency physician Augusto Pangalangan, M.D., reviewed Norman's medical records.  (Tr. 355-62.)  Dr. Pangalangan asserted that Norman could safely lift twenty pounds occasionally and ten pounds frequently.  *Id* at 356.  Dr. Pangalangan's assessment also permitted for a significantly extended sit or stand time of six consecutive hours within a regular eight-hour day.  *Id.*  Dr. Pangalangan's report was affirmed in whole by state agency physician, Dr. Jon Starr, M.D., in December of 2005.  (Tr. 362, 394.)

On July 6, 2005, Dr. Cole ordered another MRI that displayed a broad-based disc bulge at L4-L5 and L5-S1, a mild degree of bilateral foraminal stenosis in the L4-L5 disc, and a protrusion into the left neural foramen abutting the S1 nerve root.  (Tr. 297.)

On August 2, 2005, Norman had his final visit with Dr. Cole.  Dr. Cole reported that Norman's previous regimen of physical therapy and pain management had produced no benefit. (Tr. 299.)  Further, Dr. Cole opined that Norman was unable to perform any meaningful work and, as such, should seek disability.  *Id*.

*Diabetes*

On April 17, 2003, George Topalsky, M.D., administered a blood test that revealed Norman's blood glucose level was 261 mg/dl.  (Tr. 417)[1].

On November 15, 2004, Norman visited Dr. Topalsky complaining of occasional blurred vision, which Dr. Topalsky determined may be linked to his diabetic condition.  (Tr. 401-02.)

On February 22, 2005, Dr. Topalsky completed a Bureau of Disability Determination

---

[1] Normal blood glucose fasting test is a value greater than 110 mg/dl.  Merck Manual 2534, Table 296-2 (Mark H. Beers & Robert Berkow eds., Merck & Co. Inc. 17th ed. 1999).  Diabetic symptoms are diagnosed if the test indicates a level greater than or equal to 140 mg/dl.  *Id.* at 170.

5

questionnaire that characterized Norman's diabetes as uncontrolled, noting a 10.4 HgbA1c level and numbness in Norman's extremities potentially resulting from neuropathy. (Tr. 395-400.)

On November 6, 2006, Dr. Topalsky ordered blood work for Norman in order to further assess his diabetes. (Tr. 424.) The test indicated that Norman's HgbA1c level was high at 8.9%[2].

*Mental Impairments*

On January 2, 2001, Norman underwent a consultative examination by state agency psychologist Sara Derrick, Ph. D. (Tr. 250-54.) Dr. Derrick concluded that Norman had low intelligence and mild depression. (Tr. 253.) Moreover, she noted that Norman's mental ability to relate to others was moderately impaired in the workplace, though he would be able to complete simple, repetitive tasks. (Tr. 254.) Additionally, Dr. Derrick reported that, due to a borderline working memory, Norman would be moderately impaired in his ability to understand, remember, and follow work instructions. *Id.* She concluded that Norman had an adequate ability to concentrate and maintain attention, but that his mild depression would react with day-to-day stress to create a moderate impairment. *Id.*

On February 5, 2002, psychologist Catherine Flynn, Psy.D., completed a Mental Residual Functional Capacity Assessment. (Tr. 269-71.) She determined that Norman would be moderately limited in his ability to maintain attention and concentration for extended periods, and in accepting criticism and responding appropriately to criticism from supervisors. (Tr. 270.)

---

[2] The reference interval range on the data sheet is between 4.5 - 5.7% (the data sheet signaled that, as of November 26, 2006, the interval would increase to 4.8 - 5.9%) with a note that a treatment goal for diabetics should be less than 7%. (Tr. 424.)

On April 4, 2002, Diab Almahana, M.D., diagnosed Norman with major depression and alcohol abuse. (Tr. 285.) Dr. Almahana encourage Norman to enroll in therapy. *Id*.

On February 17, 2005, Norman underwent further consultative psychiatric examination by Emil Ibrahim, M.D. (Tr. 336-37.) Norman explained his daily activities as consisting of getting his kids ready for school, watching television, and occasionally washing dishes. *Id*. Dr. Ibrahim noted that Norman's mood was depressed and guarded. *Id*.

On May 5, 2005, another state review of Norman's medical record was performed by William Benninger. He determined that Norman had a mild limitation in carrying out daily activities and social functioning, but moderate limitation in maintaining concentration. (Tr. 374.) He also noted a moderate limitation in carrying out detailed instructions, interacting with the public, and changes in work setting. (Tr. 377.) Ultimately, Benninger reported that Norman's statements were credible and that he would perform best in a non-public environment. (Tr. 378.)   On August 29, 2005, therapist Rick Banas, M.A., reported that he had been seeing Norman on a weekly basis and that he had prescribed antidepressant medication. (Tr. 381.)

On December 30, 2005, Caroline Lewin, M.D., affirmed Benninger's aforementioned assessment. (Tr. 378.)

*Hearing Testimony*

At the hearing, Norman testified to the following. His back problems caused his knee to give out and for him to fall. (Tr. 435.) He must hang onto a railing when trying to climb stairs and is sometimes forced to stop a couple of times while climbing even a single flight of stairs. *Id.* He experiences pain even when lying down. *Id.* He testified that he can sit for, at most, thirty minutes at a time before it becomes too painful. *Id.* Norman also stated that he can

stand for no more than fifteen to thirty minutes at a time. *Id.* He described the pain he suffers as sharp and shooting down his back and into his right leg. (Tr. 436.) When asked about chores, Norman stated that it takes him all day to do a regular amount of dishes and that he tries to do laundry but has his nine-year old carry the baskets. *Id.*

He also mentioned the problems he has with his diabetes. He described how sensitive his feet are and that just touching something to them can create a shooting pain in his legs and numbness and tingling. (Tr. 437.) Additionally, he suffers from migraines – the worst of which can last up to five hours and can occur once every other week. *Id*. He has less painful headaches about every three days. *Id*. He also experienced numbness in his hands, which sometimes causes him to drop a glass. (Tr. 438.)

Further, Norman stated that he thinks about suicide a couple times a week and that he is depressed because he cannot do anything with his kids and because his wife must do everything. *Id.* His depression causes crying spells a couple times a week and can also cause him to lash out at his wife and kids. *Id.*

He testified that he only sleeps for a few hours a night; and, that when he does sleep, he wakes up every hour or so. (Tr. 439.) Finally, he testified that he has trouble remembering things such as taking his medicine at night or picking his kids up at school. *Id*.

The ME testified that Norman's impairments do not meet or equal any listed impairment. (Tr. 443.) Furthermore, he testified that he would only impose a twenty pound occasional lift limitation with frequent ten pound acceptability. (Tr. 444.) He also commented that he would allow Norman to occasionally stoop, kneel, crouch, and crawl. *Id.* Further, he declined to impose a restriction on being around or using heaving machinery. *Id.* Additionally, the ME

testified that a sit/stand option would not be necessary as Norman could sit for a minimum of six hours with normal breaks.  *Id*.  He could also stand/walk for a minimum of six hours.  *Id.*  The restrictions stemmed from Norman's back pain.  *Id.*  The ME did not testify concerning psychiatric matters.  (Tr. 443.)

In his first hypothetical, the ALJ asked the VE to consider a person with the following limitations: a restriction to light work; no work involving unprotected heights, ropes, ladders, and scaffolds; only occasional use of ramps and stairs; occasional kneel, crouch, crawl and stoop abilities; no use of heavy machinery; and a restriction to simple, routine tasks that can be completed in a stable work environment with only minimal contact with supervisors.  (Tr. 447.)  The second hypothetical consisted of the same restrictions with one modification – sit/stand option.  *Id.*  The VE identified at least five jobs that Norman could successfully perform using either hypothetical.  (Tr. 454-55.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[3]

---

[3] The entire five-step process entails the following: First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Norman was insured on his alleged disability onset date, September 25, 2000, and remained insured through September 30, 2006. (Tr. 17.) Therefore, in order to be entitled to POD and DIB, Norman must establish a continuous twelve month period of disability between September 25, 2000 and September 30, 2006 . Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

### IV.  Summary of Commissioner's Decision

The ALJ found Norman established medically determinable, severe impairments due to the following: lumbar degenerative disc disease; affective disorder and alcohol abuse; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Norman is unable to perform his past work activities, but has a Residual Functional Capacity ("RFC") for a limited range of light work.  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Norman is not disabled.

---

be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Norman claims the ALJ erred by: (1) failing to properly evaluate Norman's obesity; (2) failing to find Norman's diabetes to be a severe impairment; (3) failing to properly evaluate the opinions provided by treating sources; and (4) applying an improper "sit and squirm" test as a way to evaluate Norman's symptoms.  Each will be discussed in turn.

*Obesity*

Norman argues that the ALJ did not properly evaluate the impact of his obesity on his ability to do meaningful work.  Citing Social Security Ruling 02-1p, *Evaluation of Obesity* ("SSR 02-1p), Norman argues that SSR 02-1p directs the ALJ to assess the effect obesity may have upon a claimant's ability to perform routine movement and physical activity in the work

11

environment, but that the ALJ failed to do so.[4]  (Pl.'s Br. at 15.)

The Commissioner argues that the ALJ's discussion of Norman's obesity was sufficient to render a judgment.  In support of this assertion, the Commissioner cites *Bledsoe v. Barnhart*, No. 04-4531, 2006 WL 229795 at **3, 4 (6th Cir. Jan. 31, 2006).  Therein, the Sixth Circuit held that, although obesity "may" increase the severity of other limitations, SSR 02-01p acts merely as an instruction to consider obesity and not as a procedure for analyzing its impact on a claimant.  This Court concedes that SSR 02-01p does not identify a specific method of analysis.  However, the ruling is more than a mere reminder to take obesity into account.  It provides detailed interpretive guidelines and, specific to Norman's application, examples of when obesity should be given emphasis as a factor which may increase the severity of coexisting or related impairments.  *See* SSR 02-01p at 4.  Here, the ALJ's discussion was inadequate in several respects.

The ALJ's opinion contains the following discussions relevant to the obesity issue.  The ALJ noted Dr. Collis's comment that Norman was "markedly overweight" and that, because weight loss might ease the strain on his back, surgery should only be considered after Norman loses weight. (Tr. 20.)  He also referenced Dr. Cole describing Norman as "obese."  (Tr. 21.)  It was further observed that Norman "never has followed through with doctors' recommendations to lose weight despite being told that losing weight could significantly reduce his back pain."

---

[4] The ALJ did not include obesity among Norman's severe impairments, which were listed as lumbar degenerative disc disease, his affective disorder, and his alcohol abuse.  (Tr. 18.)  Though the ALJ was not bound to find that Norman was obese or that his obesity resulted in a severe limitation, the ALJ's opinion omits any discussion of Norman's obesity at step two of his analysis despite his clear belief that Norman was "obese."  He stated several times in his opinion that Norman's obesity factored into his decision.

(Tr. 22.)  The final reference to Norman's obesity is found in connection with the ME's testimony that "more than one physician had told Norman he needed to lose weight before his back pain could be properly assessed."  (Tr. 24.)  Ultimately, the ALJ stated that "[he] [had] also given consideration to Norman's obesity."  *Id.*

At step three, the ALJ must determine whether one, or a combination of more than one, of the claimant's severe impairments either meets or is equivalent in severity to one or more of the medical conditions deemed to be presumptively disabling and listed in Appendix 1 to Regulations No. 4, Subpt. P.  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926.  Though there is no obesity listing, "obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing.  This is especially true of musculoskeletal, respiratory, and cardiovascular impairments."  SSR 02-1p.  Again, the ALJ's discussion is silent with respect to any impact Norman's obesity may have had with respect to Norman's degenerative disc disease.

Furthermore, it is unclear whether Norman's obesity was factored into the ALJ's RFC findings at Step 4 and at Step 5.  Ruling SSR 02-1p outlines that "an assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment."  *See* SSR 02-1p at 6.  The ruling further discusses how obesity may impact an individual's ability to sustain both mental and physical function over time.  *Id.*  Moreover, the ruling specifically states that the combined effects of obesity with other impairments may be greater than might be expected without obesity.  An example of this being an unexpected level of arthritis pain and limitation due to the exacerbation of the condition by obesity.  *Id.*  Most importantly, the ruling concludes by stating

13

that the ALJ "will explain how [he] reached [his] conclusions on whether obesity caused any physical or mental limitations." *Id*.

Contrary to the instructions of SSR 02-1p, the ALJ here did not discuss the effect of obesity as to Norman meeting the listings or in his RFC assessment.[5]  Considering the specific reference in the ruling to the combined effect of obesity on musculoskeletal impairments, it was incumbent upon the ALJ to specifically address Norman's obesity and its contributing impact. Instead, the ALJ appears to have either discounted or discredited Norman's back pain allegations because he is obese, rather than evaluate whether his obesity exacerbates his back problems. Thus, the ALJ seems to have implicitly recognized the interrelated nature of Norman's back problems with his obesity, but failed to consider the limiting effects of these impairments in the aggregate.  In other words, the ALJ appears to have analyzed Norman's limitations not as they actually existed, but rather from the hypothetical standpoint of what Norman's limitations would be if he lost weight as recommended by his physicians.

While the ALJ did not expressly tie his finding that Norman was not disabled to his failure to follow prescribed treatment (*i.e.* lose weight), such a conclusion is implicit in his analysis.  He cites several medical opinions where Norman's failure to lose weight adversely impacted his ability to improve his back pain. (Tr. 20-21.)  Second, the ALJ appears to conclude that Norman's back pain would not be disabling if he lost weight. (Tr. 22.)  However, the ALJ never explained whether Norman's back limitations, in combination with his obesity, rendered

---

[5] During the hearing, the ALJ did note in his hypothetical questions that he was precluding work around "dangerous moving machinery or hazardous work environment" due to Norman's weight issues.  (Tr. 447.)  However, no discussion of the effect of Norman's weight on his RFC can be found in the ALJ's opinion.

14

him disabled.  "Before failure to follow prescribed treatment for obesity can become an issue in a case, [the Social Security Administration] must first find that the individual is disabled because of obesity or a combination of obesity and another impairment(s)."  *See* SSR 02-1p at 14.  The ruling goes on to discuss that it is rare to deny benefits for a "failure to follow prescribed treatment" regarding obesity.  *See* SSR 02-01p at 9.  It continues to explain that a prescribed treatment for losing weight must amount to more than a simple statement that an individual "should" or "has been advised" to lose weight.  *Id.*  Moreover, even when the prescribed treatment fits the standard established by the ruling, unless there is "clear evidence that treatment would be successful," a failure to follow such treatment will not weigh into the fact finder's decision.[6]  *Id.*  This report and recommendation should not be construed to preclude a finding that Norman failed to follow prescribed treatment.  Such a finding, however, is inappropriate without first determining whether Norman was disabled due to the combined impact of all his impairments together with his obesity.  Ultimately, it is unclear what the ALJ determined or how he arrived at his decision.

In conclusion, this Court cannot discern how the ALJ evaluated Norman's obesity.  His opinion failed to follow the applicable Social Security Administrations's procedural rules.  *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("we cannot uphold a decision by an administrative agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the

---

[6] In each case, the commenting physician used qualifying language indicating that weight loss "might" or "could" help alleviate Norman's back pain.  (Tr. 20, 22.)  It is questionable whether such language is sufficient under the ruling to constitute a failure to follow treatment.

15

evidence and the result."); *Wilson v. Comm. of Soc. Sec.*, 378 F.3d 541, 544-546 (6th Cir. 2004). Therefore, this matter should be remanded for a new opinion that addresses the following: (1) whether Norman's obesity constituted a severe impairment; (2) whether his obesity, in combination with other impairments meets or equals a listing; (3) the impact of his obesity, if any, on his RFC; and (4) if applicable, whether Norman's obesity was caused by his failure to follow prescribed treatment.

***Diabetes***

Norman argues that substantial evidence does not support the ALJ's failing to find that diabetes was a severe impairment. (Pl.'s Br. at 3.)  The record reflects that Norman visited a doctor in regards to his diabetes several times.

At step two, the Commissioner considers whether a claimant has an impairment or combination of impairments that is severe and that meets the duration requirement.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  The Social Security Association has determined that a "severe impairment" is an impairment or combination of impairments that "significantly limit a claimant's physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520 (c), 416.920 (c).  In the Sixth Circuit, if the medical evidence alone indicates that a claimant's impairments impact his or her ability to perform basic work activities in even a *de minimis* way, a determination that the impairments are not severe would be unsupported by substantial evidence.  *See Halcomb v. Bowen*, No. 86-5493, 1987 WL 36064, at *3 (6th Cir. May 27, 1987); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89-90 (6th Cir. 1985); *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 691-92 (6th Cir. 1985).  Nonetheless, if the ALJ finds at least one impairment to be "severe," he must move on to the subsequent steps in the evaluation.

16

He is not required to continue to analyze the remainder of the claimant's impairments to determine whether they too are severe. Furthermore, the Sixth Circuit has determined that the failure to further analyze the character of the other impairments while in step two is not a reversible error so long as the ALJ has already determined that at least one of the claimant's impairments is severe. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Anthony v. Astrue*, 266 Fed.Appx. 451, 2008 WL 508008 (6th Cir. February 22, 2008).

Therefore, the Commissioner argues that this precedent precludes the Court from accepting Norman's first assignment of error. (Def's. Br. at 10.) In *Maziarz*, the Sixth Circuit explained that failure to classify a condition as severe was not error because the condition could still be considered in determining whether a claimant retained sufficient RFC to engage in substantial gainful activity. *Id*. at 244.

Here, the ALJ referenced Norman's diabetic symptoms such as "numbness and tingling in his feet" and "problems holding onto things," but did not expressly discuss the limiting effects these symptoms may have on Norman's RFC. (Tr. 20.) The ALJ did, however, find that Norman's alleged limitations were "not credible to the extent that they are inconsistent with the [RFC]." *Id.* As the undersigned recommends that this matter be remanded for the reasons discussed above, the Court need not decide whether the ALJ adequately considered Norman's diabetes and corresponding symptoms when determining his RFC. Nonetheless, a more detailed analysis of Norman's diabetes would have been preferred and the ALJ should include a more thorough examination of this issue in his opinion.

17

*Treating Source and "Sit and Squirm" Test*

As it is recommended that this matter be remanded for a new decision, Norman's remaining assignments of error are rendered moot.

### VII.  Decision

For the foregoing reasons, the Magistrate Judge finds the decision of the Commissioner not supported by substantial evidence.  Accordingly, the decision of the Commissioner should be VACATED and the case REMANDED for further proceedings consistent with this Report and Recommendation.

                                              s/ Greg White
                                              U.S. Magistrate Judge

Date: July 14, 2009.

**OBJECTIONS**
**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.**  *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981).**  *See also Thomas v. Arn*, **474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**